**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| GALIL HOLDINGS LLC, individually and derivatively on behalf of RGI HILLTOP SAN ANTONIO EB LLC, RGI SONTERRA SAN ANTONIO EB LLC, and RGI LEGACY RIDGE EB LLC,<br><br>Plaintiff,<br><br>v.<br><br>DAVID RUTTENBERG, JONATHAN GORDON, RUTTENBERG GORDON INVESTMENTS, HIDDEN VALLEY CAPITAL LLC, EDWARD I. BISKIND, INTERCAPITAL HILLTOP MEMBER, LLC, INTERCAPITAL SONTERRA MEMBER, LLC, INTERCAPITAL LEGACY MEMBER, LLC, RGI HILLTOP SAN ANTONIO EB LLC, RGI SONTERRA SAN ANTONIO EB LLC, and RGI LEGACY RIDGE EB LLC,<br><br>Defendants. | ) | No. _______________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Galil Holdings LLC ("Galil"), individually and derivatively on behalf of defendants RGI Hilltop San Antonio EB LLC ("RGI Hilltop") and RGI Sonterra San Antonio EB LLC ("RGI Sonterra," and collectively, the "Companies"), and derivatively on behalf of defendant RGI Legacy Ridge EB LLC ("RGI Legacy" or the "Legacy Company"), as its Complaint against defendants David Ruttenberg ("Ruttenberg"), Jonathan Gordon ("Gordon," and together with Ruttenberg, the "Managers"), Hidden Valley Capital LLC ("Hidden Valley"), Edward I. Biskind ("Biskind"), Ruttenberg Gordon Investments ("RGI"), InterCapital Hilltop Member, LLC, and InterCapital Sonterra Member, LLC (the two InterCapital entities, the "Sponsors"), and InterCapital Legacy Member, LLC (the "Legacy Sponsor," and collectively with the Managers, Hidden Valley, Biskind, RGI, and the Sponsors, the "Defendants"), alleges as follows:

## PARTIES

1. Galil is an Illinois limited liability company with its principal place of business at 790 Estate Drive, 2nd Floor, Deerfield, Illinois 60015, and is a member of each Company.

2. Ruttenberg is an individual who serves as a manager of each Company and exercises actual control over each Company's business and affairs. Ruttenberg is a principal of Ruttenberg Gordon Investments ("RGI"), the sponsor through which Galil's investment was solicited.

3. Gordon is an individual who, together with Ruttenberg, serves as a manager of each Company. The Operating Agreements name David Ruttenberg and Jonathan Gordon as the Managers and require the approval of two Managers to take action on behalf of each Company. Gordon is also a principal of RGI.

4. Hidden Valley is a limited liability company controlled by Ruttenberg, its manager. Hidden Valley is a member and the designated partnership representative of each Company and, under the governing agreements, is entitled to receive 50% of the fees and promote distributions generated by the Companies.

5. Ruttenberg Gordon Investments ("RGI") is the sponsor, controlled by Ruttenberg and Gordon, through which Galil's investment in the Companies was solicited. RGI is named as a defendant on Galil's claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

6. Edward I. Biskind is an individual who, on information and belief, controls and manages the Sponsors and the broader "InterCapital" investment platform, and directed the Sponsors' acquisition, financing, and management of the San Antonio properties in which the Companies' capital was invested.

7. InterCapital Hilltop Member, LLC (the "Hilltop Sponsor") is a limited liability company controlled by Biskind, into which RGI Hilltop invested the Companies' capital and which was to own, directly or indirectly, the Hilltop at Shavano Apartments.

8. InterCapital Sonterra Member, LLC (the "Sonterra Sponsor") is a limited liability company controlled by Biskind, into which RGI Sonterra invested the Companies' capital and which was to own, directly or indirectly, the Sonterra Heights Apartments.

9. InterCapital Legacy Member, LLC (the "Legacy Sponsor") is a limited liability company controlled by Biskind as part of the same "InterCapital" investment platform. RGI Legacy Ridge EB LLC, an Illinois limited liability company managed by Ruttenberg and Gordon in which Galil holds an interest, holds an approximately 80% membership interest in the Legacy Sponsor, which owns, directly or indirectly, the Legacy Ridge Apartments in Atlanta, Georgia.

10. RGI Hilltop is an Illinois limited liability company and is named as a defendant because Galil asserts derivative claims on its behalf.

11. RGI Sonterra is an Illinois limited liability company and is named as a defendant because Galil asserts derivative claims on its behalf.

12. RGI Legacy Ridge EB LLC ("RGI Legacy" or the "Legacy Company") is an Illinois limited liability company managed by Ruttenberg and Gordon and formed to invest in and become a member of the Legacy Sponsor, InterCapital Legacy Member, LLC, which owns, directly or indirectly, the Legacy Ridge Apartments in Atlanta, Georgia. RGI Legacy is named as a defendant because Galil asserts derivative claims on its behalf.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because Galil asserts a claim

arising under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Galil's remaining claims, which are so related to the federal claim that they form part of the same case or controversy.

14. Each Company, and the Legacy Company, is organized under Illinois law, and each such company's governing agreement provides that Illinois law governs its interpretation.

15. This Court has personal jurisdiction over Ruttenberg because he transacted business within Illinois and purposefully availed himself of the privilege of conducting business in Illinois, including by serving as a manager of the Companies, Illinois limited liability companies organized under the Illinois Limited Liability Company Act.

16. This Court has personal jurisdiction over Gordon because he transacted business within Illinois and purposefully availed himself of the privilege of conducting business in Illinois, including his service, together with Ruttenberg, as a manager of the Companies. 735 ILCS 5/2-209 (2025).

17. This Court has personal jurisdiction over Hidden Valley because it transacted business within Illinois and purposefully availed itself of the privilege of conducting business in Illinois, including by serving as the designated partnership representative of the Companies, Illinois limited liability companies.

18. This Court has personal jurisdiction over Biskind because he transacted business within Illinois and purposefully availed himself of the privilege of conducting business in Illinois, including his control of the Sponsor entities that received and held the Illinois Companies' capital and his direction of investments made by and capital raised from the Illinois Companies.

19. This Court has personal jurisdiction over the Sponsors because each transacted business within Illinois and purposefully availed itself of the privilege of conducting business in Illinois, including their receipt and holding of the Illinois Companies' capital and their solicitation and acceptance of capital from the Illinois Companies.

20. This Court has personal jurisdiction over the Legacy Sponsor because it transacted business within Illinois and purposefully availed itself of the privilege of conducting business in Illinois, including through its Illinois members and managers and its receipt and holding of capital from Illinois investors. In addition, the Court has personal jurisdiction over the Defendants on Galil's federal securities claim under the nationwide service-of-process provision of Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

21. Venue is proper in this District under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because a substantial part of the acts and transactions constituting the alleged violations occurred in this District, including the solicitation of Galil's investment and the direction of Galil's capital to an operating account at Lakeside Bank in Chicago, Illinois.

## FACTUAL ALLEGATIONS

22. The Companies were organized to invest in a two-property, 706-unit multifamily portfolio in San Antonio, Texas, consisting of the Hilltop at Shavano Apartments and the Sonterra Heights Apartments.

23. RGI Hilltop was formed to invest in and become a member of InterCapital Hilltop Member, LLC (the "Hilltop Sponsor"), which was to own, directly or indirectly, the approximately 374-unit Hilltop at Shavano Apartments.

24. RGI Sonterra was formed to invest in and become a member of InterCapital Sonterra Member, LLC (the "Sonterra Sponsor," and together with the Hilltop Sponsor, the "Sponsors"), which was to own, directly or indirectly, the approximately 332-unit Sonterra Heights Apartments.

25. When the portfolio was offered for sale, both properties were represented as more than 94% occupied, and recent new leases had averaged approximately 15% growth.

26. The acquisition of the San Antonio portfolio was financed, in substantial part, with large, short-term, variable-rate bridge loans. The interest-rate exposure on that debt was limited only by interest-rate caps that were in place for a short, fixed term. Galil was not told, when its investment was solicited, that those rate caps were only temporary, that they would expire, or that, upon their expiration, the interest rate on the debt would increase sharply.

27. Ruttenberg, acting through RGI, solicited Galil's investment, requesting that Galil execute the Operating Agreements and wire $250,000 for each Company into RGI's operating account at Lakeside Bank no later than December 13, 2021, in advance of closings scheduled for December 17, 2021.

28. Galil contributed $250,000 to RGI Hilltop and $250,000 to RGI Sonterra, for a total investment of $500,000.

29. Galil made those contributions in reliance on the Managers' undertaking to manage the Companies and their investments for the benefit of the Companies and their members.

30. The amended and restated limited liability company agreement of each Company (each an "Operating Agreement" and collectively, the "Operating Agreements") vests management and control in the Managers and precludes non-manager members from participating in management or control. The approval of two Managers is required to take action on behalf of

each Company, and Ruttenberg, acting alone, is separately authorized to establish and operate the Companies' bank and depositary accounts. True and correct copies of the RGI Hilltop and RGI Sonterra Operating Agreements are attached as Exhibit A and Exhibit B, respectively.

31. The manager of each Company has authority to make decisions affecting the Company's business and affairs and to take actions necessary or appropriate to carry out the Company's purpose.

32. Ruttenberg caused Hidden Valley to be designated as the partnership representative of each Company and positioned Hidden Valley to receive 50% of the fees and promote distributions generated by the Companies, with the remaining 50% distributed among the members. Counsel who prepared the Operating Agreements represented Hidden Valley and Ruttenberg, and not the Companies or the other members.

33. The Operating Agreements require the Managers to cause each Company to maintain full and accurate books and records that are open to inspection by members.

34. The Operating Agreements also require the Managers to make true and complete information about each Company's business and financial condition available to its members, to distribute, at least quarterly, reports addressing the affairs of the Company, and to furnish each member its IRS Form K-1 not later than March 1 of each year.

35. The Managers caused the Companies' capital to be invested in the Sponsors, which, on information and belief, were controlled or managed by Edward I. Biskind and affiliated entities.

36. Before committing the Companies' capital, the Managers were obligated to investigate the Sponsors and their principals, the proposed financing, and the condition and prospects of the properties. On information and belief, the Managers failed to conduct reasonable due diligence before investing, including by failing to investigate the Sponsors' and Biskind's

ability to perform, the financing structure through which the Sponsors would acquire the properties and its attendant risks, the Sponsors' and Biskind's track record, and the condition and prospects of the San Antonio submarket.

37. The Sponsors financed the acquisition of the San Antonio properties with large, short-term, variable-rate bridge loans structured as interest-only with no amortization. On information and belief, the San Antonio properties were acquired as part of a larger multifamily pool capitalized with approximately $63 million in equity and approximately $159 million in floating-rate bridge debt obtained from Greystone. The variable interest rate on that debt was indexed to SOFR and was limited only by interest-rate caps that capped the index at approximately 2%, plus a fixed spread of approximately 2.85% to 3.05%, and that were scheduled to expire on January 1, 2025. The Sponsors anticipated an interest rate of approximately 4%; instead, market interest rates rose to over 8%, and while the caps remained in place, they limited the loans' interest expense against those higher rates. Once the caps expired, that protection was lost and the loans bore their unconstrained variable rates. Because the rate caps were only temporary, the financing carried substantial interest-rate and refinancing risk that would materialize upon the caps' expiration. The Defendants indicate the exorbitant interest rates are one of the reasons the investments are a near-total loss.

38. The Sponsors should have identified the debt structure, as reasonable due diligence would have identified the risk to investors the interest cap expiration posed. The skyrocketing interest rates ultimately impaired the Companies' investments through escalating interest costs, operating shortfalls, and capital calls.

39. Galil was not informed, before or at the time it invested, that the bridge financing used to acquire the properties carried a variable interest rate protected only by *temporary* interest-

rate caps, that those caps were scheduled to expire on January 1, 2025, or that, upon their expiration, the loans' interest rate would no longer be limited and the Companies would be exposed to materially higher interest costs. Neither Ruttenberg nor RGI disclosed to Galil the temporary nature of the rate caps or the substantial interest-rate and refinancing risk that their expiration would create. Had Galil known that the rate caps were temporary, not permanent, and that the debt would be exposed to higher, unconstrained interest rates once they expired, it would not have invested.

40. After the Companies invested, the Managers were obligated to supervise and monitor the Sponsors, the managers of the underlying investment, and the property manager, DayRise Residential, LLC, to whom operation of the properties was entrusted.

41. On information and belief, the Managers implemented no meaningful system for monitoring the Sponsors' management of the properties or the status of the Companies' investments.

42. Alternatively, to the extent the Managers received reports or other information concerning the Sponsors or properties, they failed to review that information adequately or act upon material indications of deteriorating performance.

43. The Managers failed to prepare or distribute the quarterly reports required by the Operating Agreements and failed to provide Galil with complete information regarding the Companies' financial condition.

44. The Managers failed to demand adequate information from the Sponsors, enforce the Companies' investor rights, or pursue available remedies as the investments deteriorated.

45. The Managers focused solely on collecting Hidden Valley's fees, and not on the oversight and supervision of the investments, repeatedly dismissing Plaintiff's concerns about lack

of information and the declining value of its membership interest.

46. Despite the properties' reported occupancy and rent growth at acquisition, the Companies' investments have been rendered effectively worthless. Against Galil's contribution of $250,000 to each Company, Galil has received total distributions of only approximately $3,602 on its Sonterra investment and approximately $3,406 on its Hilltop investment, a near-total loss of the $500,000 it contributed.

47. The properties remain encumbered by short-term, variable-rate bridge debt exceeding $51 million each; their values have declined; the investments have required repeated capital calls; and the Companies have been unable to refinance or exit on terms that would return the Companies' or Galil's capital. As a result, the Companies suffered a near-total loss of their invested capital, and the value of Galil's membership interests has been effectively eliminated.

48. Galil did not learn the true nature of the San Antonio financing from the Managers at the time of its investment. Beginning on or about October 13, 2023, Galil, through its agent and manager, inquired about the properties' performance, observing that Hilltop at Shavano appeared to be "in danger of having trouble with the lender."

49. Over the following weeks, Galil repeatedly requested information related to the investments from Ruttenberg. Those inquiries elicited only partial and incomplete responses and did not disclose to Galil the facts underlying the claims alleged herein, including that the true nature of the institutional financing had been concealed at the time of investment, the Managers' and Sponsors' knowledge and intent, and the scope of the resulting interest-rate and refinancing risk. Galil did not discover, and in the exercise of reasonable diligence could not have discovered, those facts until a later date, when temporary interest rate caps were set to expire.

50. The Managers' sustained failure to conduct reasonable due diligence before investing, to establish or use an oversight system, to obtain required financial information, to provide required reports, to respond to deteriorating performance, and to supervise persons entrusted with Company capital was grossly negligent or reckless and was not undertaken in good faith.

51. On September 23, 2026, Galil, through counsel, served a written demand, delivered by email through Ruttenberg's counsel, to inspect the books and records of RGI Hilltop and RGI Sonterra (among other entities), enumerating fourteen categories of financial and investment records, including tax returns, capital accounts, bank account statements, profit-and-loss statements, balance sheets and general ledgers, documents relating to the use of funds raised, the investor list, investment amounts and total amounts raised, marketing materials, and investor communications.

52. The demand required that all responsive documents be produced within 14 calendar days or the failure "shall be deemed a refusal to produce such documents," and imposed a litigation hold requiring Ruttenberg and any entity through which he operates to preserve all documents and communications relating to Galil's investments.

53. Defendants failed to produce all of the requested books, records, and information within the time required, including in particular the documents and information concerning the properties at issue, among them the subscription agreements; the marketing materials used in soliciting and raising capital; investor updates and communications; and the promissory notes and any extensions or modifications thereof.

54. Defendants possess or control the Companies' books, records, and financial information, including information concerning transfers among the Companies, the Sponsors,

Hidden Valley, and any affiliates.

55. On information and belief, Hidden Valley received 50% of the fees and promote generated by the Companies while the Managers failed to perform the oversight and reporting obligations on which that compensation depended; the precise amounts are to be established following the accounting demanded below.

56. Ruttenberg controls and serves as manager of Hidden Valley, which was designated partnership representative and positioned to receive 50% of the Companies' fees and promote and counsel who prepared the Operating Agreements represented Hidden Valley and Ruttenberg, not the Companies or the other members, thereby demonstrating Ruttenberg's preferential treatment of Hidden Valley, the Sponsors, and Biskind.

57. Biskind and the Sponsors knew that the Companies were Illinois limited liability companies whose capital had been entrusted to the Managers, and that the Managers owed the Companies fiduciary and contractual duties of oversight, reporting, and loyalty.

58. The Sponsors accepted and retained the Companies' capital, and Biskind and the Sponsors received, or were positioned to receive, fees, promote, and other benefits generated by the Companies' investments, while the Managers failed to monitor, obtain information from, and enforce the Companies' rights against the Sponsors.

59. On information and belief, Biskind and the Sponsors knowingly assisted, and benefited from, the Managers' failure to oversee the investments and to provide the Companies and their members with required information and reports.

**<u>THE LEGACY RIDGE INVESTMENT</u>**

60. The Legacy Company, RGI Legacy Ridge EB LLC, is an Illinois limited liability company managed by the same Managers, Ruttenberg and Gordon, and was formed to invest in

and become a member of the Legacy Sponsor, InterCapital Legacy Member, LLC, which owns, directly or indirectly, the Legacy Ridge Apartments in Atlanta, Georgia. The Legacy Company is governed by a limited liability company agreement substantially similar to the Operating Agreements, a true and correct copy of which is attached as Exhibit C.

61. Galil is a member of the Legacy Company and contributed $631,005 in capital to the Legacy Company, an amount exceeding its combined $500,000 investment in the Companies. The Legacy Company holds an approximately 80% membership interest in the Legacy Sponsor.

62. As managers of the Legacy Company, the Managers owed the Legacy Company the same fiduciary duties of care and loyalty they owed the Companies, and were obligated, before committing the Legacy Company's capital, to conduct reasonable due diligence into the Legacy Sponsor, Biskind, the financing, and the condition and prospects of the Legacy Ridge property; and, after investing, to supervise and monitor the Legacy Sponsor, Biskind, and the property manager, to obtain and review material financial and operational information, and to maintain and provide the Legacy Company and its members the information and reports to which they were entitled.

63. On information and belief, the Managers breached those duties in connection with the Legacy Ridge investment in the same manner alleged above as to the Companies, including by failing to conduct reasonable due diligence before investing, failing to establish or use a meaningful system of oversight, failing to obtain and review material information, failing to supervise the persons entrusted with the Legacy Company's capital and the Legacy Ridge property, failing to respond to indications of deteriorating performance, and failing to maintain and provide required books, records, information, and reports.

64. As a result, the Legacy Company sustained substantial losses and underperformance, and the value of Galil's membership interest in the Legacy Company diminished, in an amount exceeding the losses on the San Antonio investments given the greater capital Galil committed to the Legacy Ridge investment.

## DERIVATIVE AND DIRECT ALLEGATIONS

65. Galil was a member of each Company and of the Legacy Company when the challenged conduct occurred and has remained a member continuously.

66. Counts I through VII are asserted derivatively to recover for injuries sustained by the Companies and the Legacy Company, including the loss or dissipation of company assets and any unauthorized payment of company funds.

67. Any recovery on the derivative claims belongs to the Companies or the Legacy Company, as applicable, except to the extent the Court orders reimbursement of Galil's reasonable expenses and attorneys' fees.

68. Any demand that the Managers cause the Companies to pursue these claims would be futile and is excused because Ruttenberg controls the Companies' business and affairs, is a principal person whose conduct is challenged, and controls Hidden Valley, another defendant and alleged recipient of benefits arising from the challenged conduct; and because Gordon, the only other Manager, is Ruttenberg's business partner in RGI and is himself a defendant whose conduct is challenged.

69. On September 23, 2026 Galil served a demand to inspect the Companies' books and records within 14 days on counsel for Ruttenberg, and as of the filing of this complaint, Ruttenberg has produced some, but not all, of the books and records demanded, to which Plaintiff is entitled.

70. Illinois law permits a member to maintain an action against an LLC, manager, or another member for legal or equitable relief, with or without an accounting, to enforce rights under the operating agreement, rights under the Illinois Limited Liability Company Act, and rights arising independently of the member's relationship with the company. 805 ILCS 180/15-20 (2020).

**COUNT I: BREACH OF FIDUCIARY DUTY OF CARE**
***(Derivatively Against Ruttenberg and Gordon)***

71. Galil incorporates the foregoing paragraphs as though fully set forth herein.

72. As managers of the Companies, the Managers each owed each Company the fiduciary duty of care.

73. Under Illinois law, a manager of a manager-managed LLC is held to the statutory standards applicable to members, including the obligation to refrain from grossly negligent or reckless conduct, intentional misconduct, and knowing violations of law. 805 ILCS 180/15-3 (2022).

74. The Managers breached the duty of care by engaging in a sustained and reckless failure to:

a) conduct reasonable due diligence before committing the Companies' capital to the Sponsors;

b) advise investors that the interest rate caps on institutional debt would expire;

c) establish and maintain a reasonable system for monitoring the Companies' investments;

d) obtain and review material financial and operational information;

e) supervise the Sponsors and other persons entrusted with Company capital;

f) investigate and respond to warning signs concerning deteriorating performance;

g) enforce the Companies' contractual and investor rights;

h) maintain full and accurate Company books and records;

i) provide the reports required by the Operating Agreements; and

j) take reasonable action to preserve Company assets.

75. The Managers' conduct constituted gross negligence or recklessness, and amounted to inexcusable unawareness or inattention, rather than any informed exercise of business judgment, because it persisted across multiple reporting periods and despite the deterioration of the Companies' investments. Such conduct includes the Managers' failure to prepare and deliver the quarterly reports, as required, and their failure to act as occupancy at the properties declined and the investments faced cash challenges and potential capital calls.

76. The Managers' breaches directly and proximately caused the Companies to sustain substantial damages, including the loss and diminution of their invested capital in the Sponsors, the failure to realize the returns the investments should have generated, and the fees and promote distributions paid or payable to Hidden Valley in connection with investments the Managers failed to oversee.

**COUNT II: BREACH OF FIDUCIARY DUTY OF LOYALTY**
***(Derivatively Against Ruttenberg)***

77. Galil incorporates the foregoing paragraphs as though fully set forth herein.

78. As manager of the Companies, Ruttenberg owed each Company the fiduciary duty of loyalty.

79. The duty of loyalty includes obligations to account to the company and hold as trustee any property, profit, or benefit derived from conducting the company's business or using its property, to act fairly when dealing with the company on behalf of an adverse interest, and to refrain from competing with the company before dissolution. 805 ILCS 180/15-3 (2022).

80. Ruttenberg breached his duty of loyalty by placing his own interests, and those of his affiliate Hidden Valley, above the interests of the Companies, including by accepting 50% of the fees and promote generated by the Companies while Ruttenberg failed to perform the management and oversight obligations on which that compensation depended.

81. The arrangement with Ruttenberg's own affiliate Hidden Valley was negotiated on non-arm's-length terms, drafted by counsel representing Hidden Valley and Ruttenberg, not the Companies, and the compensation was collected or accrued while the Managers failed to perform the oversight and reporting services on which it depended. Ruttenberg's total abandonment of the investments after receipt of Hidden Valley's fees demonstrates his self-interest in collecting fees to the detriment of Plaintiff, who relied on Ruttenberg's proper performance of his duties to ensure the investments were properly managed.

82. To the extent the Operating Agreements purport to modify fiduciary obligations, they cannot eliminate or reduce the implied contractual covenant of good faith and fair dealing. *See* 805 ILCS 180/15-5 (2022).

83. As a direct and proximate result of Ruttenberg's breaches, the Companies suffered the loss and diminution of their invested capital, and Ruttenberg or his affiliate Hidden Valley obtained fees, promote distributions, and other benefits in connection with the Companies that should be disgorged and held in constructive trust for the Companies.

**COUNT III: BREACH OF FIDUCIARY DUTY/MANAGER DUTIES INDEPENDENT OF CONTRACT**
***(Derivatively Against Ruttenberg and Gordon)***

84. Galil incorporates the foregoing paragraphs as though fully set forth herein.

85. This Count arises from the Managers' fiduciary obligations as managers of the Companies and is independent of any contractual promise in the Operating Agreements.

86. Each Manager's position gave him actual control over each Company's business and affairs. By virtue of that position, each Manager owed fiduciary duties to each Company, including the duty to refrain from grossly negligent or reckless conduct, intentional misconduct, and knowing violations of law.

87. Any restriction or elimination of a manager's fiduciary duty must be clear and unambiguous, and an operating agreement may not alter the duty of care to authorize intentional misconduct or a knowing violation of law.

88. Independent of the Operating Agreements' reporting and recordkeeping provisions, the Managers breached their fiduciary duties by failing to conduct reasonable due diligence before investing, failing to exercise meaningful oversight of the Companies' investments, failing to inform themselves of material information concerning their performance, failing to respond to indications of deterioration, failing to supervise persons entrusted with Company capital, and failing to take reasonable steps to preserve Company assets.

89. The Managers' breach of these independent fiduciary duties directly and proximately caused the Companies to sustain substantial damages, including the loss and diminution of their invested capital in the Sponsors and the failure to realize the returns the investments should have generated.

## COUNT IV: BREACH OF FIDUCIARY DUTY BY FAILING TO SUPERVISE THE MANAGER OF THE INVESTMENT

***(Derivatively Against Ruttenberg and Gordon)***

90. Galil incorporates the foregoing paragraphs as though fully set forth herein.

91. As managers of the Companies, the Managers owed a continuing fiduciary duty of care that required them to keep abreast of the Companies' business and to exercise reasonable supervision and control over the Companies' investments and over the Sponsors, their principal

Biskind, and the property manager—the persons and entities serving as the managers of the underlying investment and the properties, to whom the Companies' capital and the operation of the properties were entrusted. *See* 805 ILCS 180/15-3 (2022).

92. The Managers' decisions were not made on an informed basis because they abdicated oversight and failed to become informed of material facts relevant to Galil's membership interest.

93. The Managers breached that duty by implementing no meaningful system to monitor the Sponsors' management of the properties and the status of the Companies' investments; by failing to obtain or review the financial reports and information to which the Companies were entitled; by failing to supervise the Sponsors, Biskind, and the property manager entrusted with the Companies' capital and properties; and by remaining inexcusably unaware of, and failing to act upon, the deterioration of the investments as San Antonio occupancy and market conditions declined.

94. Had the Managers exercised reasonable supervision, they would have learned of and been able to address the deterioration of the Companies' investments and the Sponsors' conduct; their sustained failure of oversight was grossly negligent or reckless and did not reflect the exercise of reasonable care.

95. As a direct and proximate result of the Managers' failure to supervise, the Companies sustained substantial damages, including the loss and diminution of their invested capital and the failure to realize the returns the investments should have generated.

**COUNT V: BREACH OF FIDUCIARY DUTY BY FAILING TO CONDUCT DUE DILIGENCE**

***(Derivatively Against Ruttenberg and Gordon)***

96. Galil incorporates the foregoing paragraphs as though fully set forth herein.

97. Before committing the Companies' $500,000 of capital to the Sponsors, the Managers' fiduciary duty of care required them to inform themselves of the material facts necessary to make an informed investment decision, including the Sponsors' and Biskind's track record and ability to perform, the financing structure through which the properties would be acquired and its attendant refinancing and interest-rate risk, and the condition and prospects of the properties and the San Antonio submarket.

98. A manager may not close his eyes to the circumstances of an investment or commit company capital without becoming sufficiently informed to make an independent business decision; the failure to do so is a breach of the duty of care and defeats the presumption of informed judgment.

99. The Managers breached their duty of care by committing the Companies' capital to the Biskind-controlled Sponsors without conducting reasonable due diligence, including by failing to investigate the Sponsors' and Biskind's ability to perform, the financing structure and its refinancing and interest-rate risk, and the condition and prospects of the properties and market. In particular, the Managers failed to review or investigate the Sponsors' and Biskind's track record and ability to perform, the financing documents and their refinancing and interest-rate risk, and the condition and prospects of the properties and the San Antonio submarket.

100. The Manager's failure to investigate was grossly negligent or reckless, amounting to great negligence rather than a mere mistake of business judgment.

101. As a direct and proximate result of the Managers' failure to conduct due diligence, the Companies committed and lost capital they would not have committed had the Managers been adequately informed, and the Companies sustained substantial damages, including the loss and diminution of their invested capital.

**COUNT VI: BREACH OF FIDUCIARY DUTY (LEGACY RIDGE INVESTMENT)**
***(Derivatively Against Ruttenberg and Gordon on Behalf of RGI Legacy Ridge EB LLC)***

102. Galil incorporates the foregoing paragraphs as though fully set forth herein.

103. As managers of the Legacy Company, Ruttenberg and Gordon each owed the Legacy Company the fiduciary duties of care and loyalty, and were held to the statutory standards applicable to members of a manager-managed limited liability company, including the obligation to refrain from grossly negligent or reckless conduct, intentional misconduct, and knowing violations of law. 805 ILCS 180/15-3 (2022).

104. Those duties required the Managers, before committing the Legacy Company's capital, to conduct reasonable due diligence into the Legacy Sponsor, Biskind, the financing, and the condition and prospects of the Legacy Ridge property; and, after investing, to supervise and monitor the Legacy Sponsor, Biskind, and the property manager, to obtain and review material financial and operational information, and to maintain and provide the Legacy Company and its members the information and reports to which they were entitled.

105. The Managers breached those duties, in the same manner alleged above as to the Companies, by failing to conduct reasonable due diligence before investing, failing to establish and maintain a reasonable system for monitoring the Legacy Ridge investment, failing to obtain and review material financial and operational information, failing to supervise the Legacy Sponsor, Biskind, and the property manager entrusted with the Legacy Company's capital and the Legacy Ridge property, failing to investigate and respond to indications of deteriorating performance, and failing to maintain full and accurate books and records and to provide the required reports and information.

106. The Managers' conduct constituted gross negligence or recklessness, amounted to inexcusable unawareness or inattention rather than an informed exercise of business judgment, and was not undertaken in good faith.

107. As a direct and proximate result of the Managers' breaches, the Legacy Company sustained substantial damages, including the loss and diminution of its invested capital and the failure to realize the returns the investment should have generated, an amount exceeding the losses on the San Antonio investments, given the greater capital Galil committed to the Legacy Ridge investment.

## COUNT VII: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

***(Derivatively Against Biskind, InterCapital Hilltop Member, LLC, InterCapital Sonterra Member, LLC, and InterCapital Legacy Member, LLC)***

108. Galil incorporates the foregoing paragraphs as though fully set forth herein.

109. The Managers, as managers of each Company, performed wrongful, injury-causing acts by breaching their fiduciary duties of care and loyalty to the Companies as alleged above.

110. Biskind and the Sponsors were aware of their role in the Managers' misconduct at the time they provided assistance, knowing that the Companies' capital had been entrusted to the Managers and that the Managers owed, and were failing to perform, their oversight, reporting, and loyalty obligations to the Companies.

111. Biskind and the Sponsors knowingly and substantially assisted the Managers' breaches by accepting and retaining the Companies' capital, maintaining the investment and fee arrangements despite the deterioration of the Companies' investments, and withholding from the Companies the information needed to detect and address the Managers' failures. Any additional acts of substantial assistance are to be established following discovery.

112. Biskind and the Sponsors benefited from the Managers' breaches, including through the fees, promote, compensation, and other amounts generated by, retained in, or distributed in connection with the Companies' investments.

113. As a direct and proximate result of Biskind's and the Sponsors' knowing and substantial assistance, the Companies sustained substantial damages, including the loss and diminution of their invested capital and the failure to realize the returns the investments should have generated, for which Biskind and the Sponsors are liable jointly and severally with the Managers.

114. Ruttenberg and Gordon also serve as the managers of RGI Legacy Ridge EB LLC, an Illinois limited liability company in which Galil holds an interest and which holds an approximately 80% membership interest in the Legacy Sponsor, InterCapital Legacy Member, LLC. In that capacity, the Managers owed RGI Legacy Ridge EB LLC the same fiduciary duties of care and loyalty they owed the Companies, and they breached those duties in connection with the Legacy Ridge investment in the same manner alleged above, including by failing to conduct reasonable due diligence, to supervise and monitor the Legacy Sponsor and the Legacy Ridge investment, and to obtain and provide required information and reports.

115. The Legacy Sponsor, like the Sponsors, was controlled by Biskind as part of the same "InterCapital" investment platform and was aware of its role in the Managers' misconduct at the time it provided assistance, knowing that RGI Legacy Ridge EB LLC's capital had been entrusted to the Managers and that the Managers owed, and were failing to perform, their oversight, reporting, and loyalty obligations in connection with the Legacy Ridge investment.

116. The Legacy Sponsor knowingly and substantially assisted, and benefited from, the Managers' breaches by accepting and retaining the capital invested through RGI Legacy Ridge EB

LLC, maintaining the investment and fee arrangements despite the deterioration of the investment, and withholding the information needed to detect and address the Managers' failures, including through the fees, promote, compensation, and other amounts generated by, retained in, or distributed in connection with the Legacy Ridge investment. Any additional acts of substantial assistance are to be established following discovery.

117. As a direct and proximate result of the Legacy Sponsor's knowing and substantial assistance, RGI Legacy Ridge EB LLC sustained substantial damages, including the loss and diminution of its invested capital and the failure to realize the returns the investment should have generated—an amount exceeding the losses on the San Antonio investments, given the greater capital committed to the Legacy Ridge investment, for which the Legacy Sponsor is liable jointly and severally with the Managers.

**COUNT VIII: VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b-5**
***(Individually Against Ruttenberg and Ruttenberg Gordon Investments)***

118. Galil incorporates the foregoing paragraphs as though fully set forth herein.

119. Galil's membership interests in each Company are "securities" within the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), including as "investment contracts," because Galil invested money in a common enterprise with the expectation of profits to be derived solely from the managerial efforts of Ruttenberg and Gordon, in whom the Operating Agreements vest exclusive management and control.

120. In connection with the purchase and sale of those securities, Ruttenberg, directly and through RGI, used the means and instrumentalities of interstate commerce, the mail, and interstate wire communications, including the interstate wire transfer of Galil's capital to the operating account at Lakeside Bank.

121. In connection with, and for the purpose of inducing, Galil's purchase of those securities, Ruttenberg, through RGI, made untrue statements of material fact and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth above, including but not limited to representing that institutional debt used to finance the purchase of the investment properties involved capped interest rates.

122. In reality, those interest rate caps were set to expire, and the new, exorbitant interest rates set off a domino effect of the inability to refinance and near total loss of Plaintiff's investment. Ruttenberg thereby engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Galil. As alleged in the Factual Allegations above, Galil did not learn of the concealed financing at the time of its investment and did not discover, and in the exercise of reasonable diligence could not have discovered, the facts constituting the violation until a later date.

123. Ruttenberg and RGI acted with intent to deceive, manipulate, or defraud, or with reckless disregard for the truth in making the misrepresentations and omissions alleged herein.

124. The misrepresented and omitted facts were material, and their disclosure would have significantly altered the total mix of information available to Galil in deciding whether to invest.

125. Galil justifiably relied on Ruttenberg's and RGI's misrepresentations and omissions in deciding to purchase the securities and to contribute $500,000 and would not have invested had the omitted facts been disclosed.

126. As a direct and proximate result of the foregoing, Galil suffered economic loss. The very risk that Ruttenberg and RGI concealed—that the bridge financing was protected only by temporary interest-rate caps whose expiration would expose the debt to sharply higher rates—later

materialized: the rate caps expired, interest costs escalated as the rate rose from the anticipated approximately 4% to over 8%, the properties required repeated capital calls, their values declined, and Galil's $500,000 investment was rendered effectively worthless, establishing loss causation.

127. By reason of the foregoing, Ruttenberg and RGI violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

128. As a direct and proximate result of the foregoing violations, Galil was damaged in the amount of its $500,000 investment, which has been effectively lost in its entirety, together with interest, and is entitled to damages and rescissory relief under Section 10(b) and Rule 10b-5.

## COUNT IX: ACCOUNTING
***(Individually and Derivatively Against Defendants)***

129. Galil incorporates the foregoing paragraphs as though fully set forth herein.

130. Defendants exercise control over the Companies' books, records, bank information, and financial information and over information concerning the flow of funds among the Companies, the Sponsors, Hidden Valley, the Managers, Biskind, and any affiliates.

131. The accounts at issue involve multiple entities, investments, distributions, fees, promote payments, expenses, reimbursements, capital accounts, and related-party transactions that cannot be determined from the information available to Galil.

132. Galil has requested information concerning those matters, including by its September 23, 2026 demand, but Defendants produced only some of the requested records and have not provided complete books, records, and reports.

133. Illinois law permits a member to seek legal or equitable relief, with or without an accounting of the company's business, to enforce the member's rights. 805 ILCS 180/15-20 (2020).

134. Galil has no adequate remedy at law for these matters. The need for an accounting arises from the Managers' breach of their fiduciary duties, the complex and interrelated nature of the multi-entity accounts, and the need for discovery of information within Defendants' exclusive possession and control, and the amounts Defendants must restore cannot be ascertained without an accounting.

135. A full accounting is necessary to determine:

a) all funds contributed to or received by each Company;

b) all transfers to or from the Sponsors and their affiliates;

c) all fees, promote distributions, compensation, reimbursements, and other benefits paid to Defendants or their affiliates;

d) each Company's assets, liabilities, receipts, disbursements, and capital accounts;

e) the basis and authorization for each related-party payment;

f) the present value and status of each Company's investment; and

g) the amounts, if any, that Defendants must restore to the Companies or pay to Galil.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Galil Holdings LLC respectfully requests that the Court enter judgment in its favor and:

a) Award compensatory damages on the derivative claims, payable to the Companies or the Legacy Company, as applicable, in an amount to be proven at trial;

b) Award Galil its direct damages for the denial of its contractual and statutory rights in an amount to be proven at trial;

c) Order Defendants to produce complete Company books, records, financial information, tax materials, bank records, Sponsor reports, quarterly reports, and other information to which Galil is entitled;

d) Order a full accounting of each Company's assets, liabilities, receipts, disbursements, investments, capital accounts, and related-party transactions;

e) Order Defendants to account for and disgorge all unauthorized fees, promote distributions, compensation, reimbursements, distributions, profits, and other benefits obtained through the alleged breaches;

f) Impose a constructive trust over funds and property traceable to any unauthorized payment or benefit;

g) Declare the parties' rights and obligations concerning Company books, records, financial information, and quarterly reports under the Operating Agreements and Illinois law;

h) Temporarily, preliminarily, and permanently enjoin Defendants from withholding required Company information, dissipating Company assets, or making undisclosed related-party payments pending completion of the accounting;

i) Remove Ruttenberg and Gordon as managers only upon proof of a contractual or statutory basis for removal and appoint a receiver or other appropriate fiduciary if warranted by the evidence;

j) Award prejudgment and post-judgment interest as permitted by law;

k) Award Galil its reasonable attorneys' fees and costs to the extent authorized by the Operating Agreements and applicable law; and

l) Award Galil rescission of its purchase of the securities and recovery of the investment it paid, plus statutory interest, upon tender of its membership interests, or in the alternative damages, together with reasonable attorneys' fees and costs, pursuant to 815 ILCS 5/13;

m) Award Galil damages and rescissory relief for Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, together with prejudgment and post-judgment interest; and

n) Grant such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: November 3, 2026

Respectfully submitted,

**GALIL HOLDINGS LLC, individually and derivatively on behalf of RGI HILLTOP SAN ANTONIO EB LLC, RGI SONTERRA SAN ANTONIO EB LLC, and RGI LEGACY RIDGE EB LLC,**

By: *<u>/s/ Christina E. Carriere Lutz</u>*
One of Its Attorneys

Christina E. Carriere Lutz
Andrew J. Henning
Manley Burke, LPA
500 W. Madison St., Suite 1000
Chicago, IL 60661
(312) 395-7246
christina.lutz@manleyburke.com
ahenning@manleyburke.com